**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 20-66-1 (RDM)** |
| | : | |
| **v.** | : | **Sentencing:  January 12, 2024** |
| | : | |
| **CHARLES EDWARDS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE**
**AND MEMORANDUM IN AID OF SENTENCING**

The United States respectfully submits this memorandum in aid of sentencing for Charles Edwards (hereinafter "the defendant", "Edwards," or "Defendant Edwards").  Together with Sonal Patel (hereinafter "Patel" or "Defendant Patel"), who entered a guilty plea, and Murali Venkata (hereinafter "Venkata" or "Defendant Venkata"), who was convicted at trial,[1] Defendant Edwards engaged in a scheme to steal proprietary government software and databases containing sensitive law-enforcement information and the personally identifying information of over 200,000 federal employees.  The United States Sentencing Guidelines (hereinafter "U.S.S.G.") recommend that the Court sentence Edwards to between 24 and 30 months' imprisonment based on a total offense level of 17.  Because he provided substantial assistance to the United States, the government respectfully moves for a downward departure of 3 levels pursuant to U.S.S.G. § 5K1.1, resulting in an offense level of 14 and a Guidelines range of 15 to 21 months.  The government respectfully requests that the Court impose a sentence of 21 months' imprisonment and a 3-year term of supervised release.

---

[1]     Defendant Venkata is also charged in 20-cr-66.  The case number for Defendant Patel is 19-cr-81.

# I.     BACKGROUND

## A. The Theft and Fraud Scheme

The defendants, Charles Edwards, Sonal Patel, and Murali Venkata, engaged in an unlawful scheme to convert proprietary government software and databases to their own use, for the purpose of developing a commercial software product that they intended to sell back to the government at a profit.  To accomplish that unlawful end, they disclosed vast amounts of sensitive information contained within the stolen databases, including the Personally Identifying Information ("PII") of over 200,000 government employees, to foreign software developers located in India.  They marketed their new case management system to a representative of another government agency, all the while concealing and failing to disclose the fact that it was being built using stolen government property.

Edwards previously worked at the Department of Homeland Security – Office of Inspector General ("DHS-OIG"), where he rose to the post of Acting Inspector General.  *See* Trial Tr. 3/29/22 PM, 6:18–24 (Edwards).  Edwards left DHS-OIG following allegations that he engaged in a conflict of interest and misused government property.  *Id.* at 7:2–15.  Venkata was employed at DHS-OIG as an Information Technology ("IT") Specialist.  He reported to Patel, a supervisor in the IT Division at DHS-OIG Headquarters.  *See* Trial Tr. 4/5/22 PM, 41:6–9 (Patel).  Edwards, Patel, and Venkata had all previously been employed at the United States Postal Service – Office of Inspector General ("USPS-OIG").  *See* Trial Tr. 3/29/22 PM, 19:18–22 (Edwards); Trial Tr. 4/5/22 PM, 41:3 (Patel).

DHS-OIG used a case management system known as the Enforcement Database System ("EDS").  *See* Trial Tr. 3/29/22 AM, 31:11–32:13 (Steel).  EDS's database housed sensitive information about DHS-OIG's investigations as well as PII of government employees.  *Id.*  USPS-

OIG's case management system was known as PARIS, and its associated database was known as STARS.  *See* Trial Tr. 99:11–16 (Edwards).  Like EDS's database, STARS contained law-enforcement sensitive data and PII.  *Id.* at 99:18.

After Edwards left DHS-OIG, he started his own business, Delta Business Solutions.  *See* Trial Tr. 3/29/22 PM, 9:22–24 (Edwards).  His plan was to develop a new case management system that he could market to Offices of Inspector General across the federal government.  *Id.* at 11:6–15.  Edwards hired software developers in India to build his new commercial case management system.  *Id.* at 56:20–24.  Edwards decided to steal DHS-OIG's and USPS-OIG's existing systems to show the developers in India how the new system should work.  *Id.* at 11:17–13:20.  Edwards enlisted Patel and Venkata, who were still employed at DHS-OIG, to help him procure the government's software systems to provide technical expertise.  *Id.*  In a phone call in early May 2016, Edwards and Venkata discussed their unlawful agreement to use stolen government software to build the new case management system.  *See* Trial Tr. 3/29/22 PM, 30:7–37:12 (Edwards); *id.* at 43:13–44:11.

On May 26, 2016, Edwards and Patel met with Peter Paradis, an official at the U.S. Department of Agriculture – Office of Inspector General ("USDA-OIG"), to pitch him on their new case management system.  *See* Trial Tr. 3/29/22 PM, 35:12–36:4 (Edwards).  The following day, Patel copied the EDS source code and databases from the DHS-OIG computer network and copied them onto optical disks to provide to Edwards.  *See* Trial Tr. 3/29/22 PM, 39:25–40:3 (Edwards); Trial Tr. 3/31/22 PM, 93:14–95:25 (Reynolds); Trial Tr. 4/1/22 AM, 37:7–38:16 (Reynolds).  She also emailed him an internal DHS-OIG document containing instructions for installing EDS on his home server.  *See* Trial Tr. 3/29/22 PM, 39:3–12 (Edwards); GEX 30.

On May 30, 2016, which was Memorial Day, the conspirators met at Patel's home to discuss the plan. *See* Trial Tr. 3/29/22 PM, 42:3–18 (Edwards); Trial Tr. 5/4/22 PM, 85:12–88:10 (Patel). Patel showed a demo of EDS to Edwards, and Venkata explained new features and technological trends. *See* Trial Tr. 5/4/22 PM, 87:3–87:21 (Patel). At that meeting, Venkata agreed to help Edwards set up the code that Patel had stolen on Edwards's home servers to show the Indian software developers. *See* Trial Tr. 3/29/22 PM, 44:18–45:24 (Edwards). Venkata subsequently assisted Edwards in setting up the stolen code and databases on Edwards's home servers and on a laptop that Edwards brought with him to India to show the programmers. *See id*. at 52:15–53:25, 57:20–63:3, 71:1–88:12; GEX 19, at 1–5; GEX 31.

In March 2017, Edwards decided to set up PARIS and STARS on a server located in his home to show the programmers in India how the audit module should work. *See* Trial Tr. 3/29/22 PM, 98:25–99:4 (Edwards). Edwards reached out to Patel to copy PARIS and STARS from the DHS-OIG server onto DVDs, which he could use to reboot the program on his home server. Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 18, at 55–56. Because she was teleworking, Patel asked Venkata to deliver the DVDs to Edwards. *See* Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 17, at 9. Venkata delivered the package containing the DVDs to Edwards outside DHS-OIG's offices. *See* Trial Tr. 3/29/22 PM, 107:11–19, 109:15–110:1 (Edwards); GEX 84. Venkata then assisted Edwards in installing PARIS and STARS from the DVDs and getting the server up and running. *See* Trial Tr. 3/29/22 PM, 110:17–111:1 (Edwards).

Edwards met with Paradis on multiple occasions to try to sell his new case management system to USDA-OIG. At no point did Edwards disclose that his "new" case management system was being developed with stolen proprietary code and sensitive databases, including PII. *See* Trial Tr. 3/31/22 AM, 79:1–15 (Paradis). Edwards and Patel did, however, make many statements about

the nature and development of their commercial version of EDS that were so incomplete as to be misleading. *See, e.g.*, GEX 10A, at 5 (stating that the "new concept . . . is the same thing [as EDS]" but "it's more modularized"); *id.* at 5 (stating that "the functionality [of EDS] is there but current times and user management and maintenance is easier in the long term"); GEX 11A, at 15 (describing Next Gen EDS as "similar in concept" to EDS); *id.* at 16 (stating he was "not wanting to rebuild EDS because I've seen the flaws"); *id.* at 20 (describing new system as "22nd century EDS"); *id.* at 29 (stating that Venkata could "give [Paradis] the concept" of eSubpoena); DEX 26A, at 2 (stating that the new version is "not like DHS because DHS code is so, you know, cobbled together, you would get lots of issues . . . it's not that version").

### B. Defendant Edwards's Role in the Scheme

Defendant Edwards was the originator and leader of the scheme and the only member of the scheme who stood to receive a direct financial benefit. Moreover, as a former Acting Inspector General, he was the highest-ranking member of the conspiracy. As established at trial, Edwards came up with the idea of developing a commercial case management system and selling it back to the government. *See* Trial Tr. 3/29/22 PM, 11:6–22 (Edwards). He recruited Patel and Venkata into the scheme to provide inside access and technical knowledge that he lacked. *Id.* at 12:1–13:23. Edwards engaged the software developers in India and decided to build a working version of the government's software programs on his home servers to assist the developers in building the new system. *Id.* at 44:21–45:24. He caused Patel to copy EDS and PARIS/STARS from government servers and give him the copies for that purpose. *Id.* at 39:3–40:3; 106:4–12. Edwards traveled to India to meet with the developers, bringing with him a laptop containing the stolen software and databases. *Id.* at 59:12–62:18, 66:2–14. He also directed Venkata to set up the stolen software on his home servers and granted the developers access to those servers. *Id.* at 71:4–22.

Further, Edwards led the efforts to sell the commercial version of EDS back to the government. Finally, Edwards met with Peter Paradis on multiple occasions to pitch him on the new system, while concealing and failing to disclose that he was building it using stolen government software. *See id*. at 35:12–36:4; Trial Tr. 3/31/22 AM, 79:1–15 (Paradis).

### C. Procedural History

On April 4, 2019, Patel pleaded guilty, pursuant to a plea agreement, to an Information charging her with one count of Conspiracy to Commit Theft of Government Property in violation of 18 U.S.C. § 371.

On March 5, 2020, a grand jury returned an Indictment charging defendants Venkata and Edwards with Conspiracy to Commit Theft of Government Property and to defraud the United States in violation of 18 U.S.C. § 371 (Count One), Theft of Government Property in violation of 18 U.S.C. §§ 641 & 2 (Count Two), Wire Fraud in violation of 18 U.S.C. § 1343 (Counts Three through Ten (Edwards) and Eleven (Edwards and Venkata)), and Aggravated Identity Theft in violation of 18 U.S.C. §§ 1028A & 2 (Counts Twelve through Fifteen).  The Indictment also charged Venkata with Destruction of Records in violation of 18 U.S.C. § 1519 (Count Sixteen).

On January 14, 2022, Edwards pleaded guilty, pursuant to a plea agreement, to Counts One and Two of the Indictment, charging him with Conspiracy and Theft of Government Property, respectively.

Venkata proceeded to jury trial beginning on March 28, 2022.  On April 11, 2022, the jury returned a verdict finding Venkata guilty of all counts on which they deliberated: Counts One, Two, Eleven, Thirteen, and Sixteen.  On August 10, 2023, the Court granted the government's motion to dismiss Count Thirteen based on *Dubin v. United States*, 599 U.S. 110 (2023).  On

November 14, 2023, the Court dismissed the remaining counts of Aggravated Identity Theft. Venkata is scheduled to be sentenced on January 4, 2023.

## II.   DISCUSSION AND RECOMMENDATION

### A. Sentencing Guidelines Calculation

The government submits that the following offense level calculation applies to Defendant Edwards:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(G) | Loss more than $250,000 but less than $550,000 | +12 |
| U.S.S.G. § 3B1.1 | Role in the Offense | +2 |
| | Total | 20 |

The government also agreed to a three-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and § 3E1.1(b).  The total adjusted offense level is 17.

The Sentencing Guidelines calculation above reflects a change from the plea agreement. Specifically, in the plea agreement, the parties stipulated to a loss amount of greater than $3,500,000, based on the value of the stolen property, resulting in an 18-point enhancement under U.S.S.G. § 2B1.1(b)(1)(J).  The government subsequently determined that the loss amount should be calculated based on the cost of remediating the harm from the property theft, specifically, the cost of notifying the victims of the data breach and providing them credit monitoring services.  The commentary to Section 2B1.1 provides that "loss" is "the greater of the actual loss or intended loss."  U.S.S.G. § 2B1.1 n.3(A).  Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* § 2B1.1 n.3(A)(i).  Pecuniary harm, in turn, "means harm that is monetary or that otherwise is readily measurable in money" and not "non-economic harm."  *Id.*

§ 2B1.1 n.3(A)(iii).  And "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1 n.3(A)(iv).  Here, the offense conduct involved copying rather than removing the property and therefore did not result in the actual loss of its full value.  Rather, the government's out-of-pocket loss consisted of approximately $400,000 spent on notifying the victims and providing them credit monitoring services.  *See* Trial Tr. 3/29/22 AM, 63:6–67:8 (Steel); GEX 82.  Accordingly, the loss amount is between $250,000 and $550,000, resulting in a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G).

The PSR's Guidelines calculation is eight levels different than the government's.  *See* PSR ¶¶ 69, 73.  Six of those levels are accounted for by the government's changed position in the loss amount calculation as described in the preceding paragraph.  The remaining two levels are accounted for by the PSR's application of a four-level increase for Defendant Edwards's role in the offense rather than the two-level increase applied in the plea agreement.  *See* PSR ¶¶ 52, 67, 226.  The government submits that, although the defendant was an organizer or leader in the criminal activity, the scheme neither "involved five or more participants" nor was "otherwise extensive" as required for the four-level increase under § 3B1.1(a).  For that reason, and because the parties agreed in the plea agreement that the appropriate adjustment under the plea agreement was a two-level increase, the government submits that only a two-level adjustment under § 3B1.1(c) should be applied.

Defendant Edwards has a criminal history score of zero (PSR ¶ 76) and, therefore, is in criminal history category I.[2]

---

[2]    Given Defendant Edwards's aggravating role in the scheme and corresponding adjustment under USSG § 3B1.1, he is ineligible for the new two-point adjustment for certain zero-point

**B. Downward Departure under Section 5K1.1 of the Guidelines**

The government moves for a downward departure under Section 5K1.1 of the Sentencing Guidelines based on the defendant's substantial assistance in the prosecution of his co-defendant, Murali Venkata. The government respectfully submits that a downward departure of three levels, resulting in an offense level of 14 and a Guidelines range of 15 to 21 months, is appropriate.

Edwards agreed to plead guilty in January 2022 and subsequently testified at the trial of his co-defendant, Murali Venkata. Leading up to his testimony at trial, Edwards participated in four lengthy witness conferences, including sessions on the weekend and one that went late into the evening during the beginning of trial. At those meetings, Edwards was well prepared, cooperative, and forthcoming, demonstrating his commitment to being truthful and assisting the government. His statements were very helpful in developing the government's understanding of the details of the scheme and the significance of various pieces of evidence. In particular, Edwards explained in detail what Venkata did to advance the scheme and provided critical insight into the significance of the text messages that he and Venkata exchanged in furtherance of the scheme.

Edwards was one of the government's key witnesses at trial. He was on the stand for over a full day of trial, including extensive cross examination from defense counsel. Edwards testified in detail about how the scheme came about, how it worked, and the role that Venkata played. He explained how the text message evidence corresponded to key events that occurred during the scheme, such as Venkata's efforts to set up the stolen government software on Edwards's private laptop and servers. Edwards also testified directly to Venkata's knowledge of the scheme's

---

offenders under § 4C1.1. That provision requires a defendant to meet ten criteria, including that "the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) . . . ." Therefore, Defendant Edwards's aggravating role in this case precludes him from benefitting from the new zero-point offender adjustment.

purpose, providing important corroboration of the government's evidence of that element. He did not attempt to minimize or make excuses for his own conduct, instead accepting responsibility for his leading role in the scheme. In sum, Edwards provided very substantial assistance in the prosecution of Defendant Venkata.

In determining the appropriate reduction under U.S.S.G. § 5K1.1, a court may consider the following, non-exclusive, factors:

> (1) the Court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). Here, the first three factors weigh strongly in favor of a reduction. As discussed, Edwards provided extensive, truthful, useful assistance to the government in preparing for trial and by testifying at trial. The fourth factor is not applicable. As for the fifth factor, although Edwards did not agree to plead guilty until January 2022, just over a month before trial was set to begin, he was nonetheless very helpful to the government both before and during trial. Accordingly, that factor, too, weighs in favor of a downward reduction. The government submits that a downward reduction of 3 levels, resulting in an offense level of 14, appropriately reflects the extent of Edwards's assistance.

With a total offense level of 14 and a criminal history category of I, Defendant Edwards's Guidelines range is 15 to 21 months of incarceration. The Court may also impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b).

### C. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(1) and (2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

1. <u>The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense</u>

This scheme involved coordination by current and former government employees who had a duty to uphold the law and work in the interest of the agency, DHS-OIG. Instead, they worked to convert government resources – software and databases containing the PII of hundreds of thousands of their fellow employees – for their own use. The goal to develop a commercial software product that could be sold back to the government was directly at odds with the oath they each took as DHS-OIG employees. It was also directly at odds with the very mission of DHS-OIG: "[t]o provide independent oversight and promote excellence, integrity, and accountability within DHS." U.S. Dep't of Homeland Security Office of Inspector General, https://www.oig.dhs.gov/about (last visited Nov. 13, 2023). As stated in the DHS-OIG victim impact statement by the current DHS Inspector General, Dr. Joseph Cuffari, "the Inspectors

General exist to help *protect the integrity* of government, *improve program efficiency and effectiveness*, and *prevent and detect fraud, waste, and abuse* in Federal agencies. Edwards' crimes were the antithesis of DHS OIG's mandate." DHS-OIG VIS at 2 (emphasis in original).[3] Edwards's criminal scheme spanned from October 2014 to April 2017, giving him ample time to reflect on his actions before choosing to continue.

Defendant Edwards had not just been an employee of DHS-OIG; he was its Acting Inspector General. As stated by Dr. Cuffari, "Edwards' actions were particularly egregious given his crimes displayed an abuse of trust and absence of personal integrity expected and required of all Inspectors General." *Id.* at 1. Dr. Cuffari also wrote, "it was the defendant's past leadership positions at DHS OIG that allowed him to exploit his relationships with government personnel and enabled access to systems and information he hoped would allow him to amass millions of dollars." *Id.* at 2.

The defendants' use of the DHS-OIG and USPS-OIG information for their self-serving ends also exposed the PII of hundreds of thousands of their colleagues and other individuals to foreign software developers. This breach exposed those individuals to the risk that their PII would be used improperly.

After the theft of the personal identifying information was discovered, DHS-OIG had to notify Congress, the public, and individuals affected by the breach. Trial Tr. 3/29/22 AM at 60:14–23 (Steel). The agency notified affected individuals and offered them credit monitoring services at a cost of over $400,000. *Id.* at 63:14–67:8; GEX 82. DHS-OIG had to pay for a security

---

[3] Dr. Cuffari's victim impact statement on behalf of DHS-OIG has been filed on Pacer as ECF No. 195. Given the ECF filing includes a cover page from the Probation Office, the citations in the instant sentencing memorandum are to the letter itself so that the page citations match the pagination at the bottom of Dr. Cuffari's letter.

assessment to "come in and evaluate EDS front end to back end . . . as well as procedures." Trial Tr. 4/4/22 AM, 99:3–5 (Steel). The theft also affected DHS-OIG's operations, in that whistleblowers felt a chilling effect and DHS-OIG's law-enforcement partners were hesitant to work with them. *See id.* at 82:13–21. As stated in the DHS-OIG victim impact statement by Dr. Cuffari, "[t]he harm to DHS OIG's reputation and the morale of its employees is manifest," with the defendant's actions causing "far-reaching and long-lasting consequences that [DHS-OIG] continue[s] to deal with today." DHS-OIG VIS at 2. In addition to the remedial expenses discussed above, Dr. Cuffari described, "Conservatively, [DHS-OIG] <u>alone</u> spent approximately 3,686 man-hours on the underlying investigation at a taxpayer cost of more than $237,000. These costs do not account for the hundreds of manhours expended by *other* DHS OIG program offices dedicated to containing the breach and dealing with the aftermath of Edwards' crimes." *Id.* at 3-4 (emphasis in original).

USPS-OIG's PARIS system and STARS database were similar to EDS and housed similar types of information, including law-enforcement information and PII. *See id.* at 37:3–18; Trial Tr. 3/30/22 PM, 67:23–70:5 (Lowder). And, like DHS-OIG, USPS-OIG had to provide credit monitoring services to the individuals whose data was breached, at a cost of $33,147.84. *See* Trial Tr. 3/31/22 AM, 9:4–7 (Balfour); Exhibit A (invoices to USPS for notification and credit monitoring services). A victim impact statement on behalf of USPS-OIG is attached here as Exhibit B. In that victim impact statement, current Inspector General Tammy L. Hull wrote that, unlike the financial costs of remediation, "the consequential operational and reputational damage[] is incalculable." Inspector General Hull further wrote, "Computer and information technology systems can be secured and improved, but the confidence and trust the American citizen has in its government institutions and the missions they dutifully uphold are not as easily repaired."

The offense and its aftermath caused a lot of harm.  It caused financial and reputational consequences to the affected agencies, exposed personal information of the affected individuals, and violated the core principles of the agency that the defendant and his co-conspirators were entrusted to protect.  Accordingly, a sentence of incarceration is warranted to reflect the seriousness, nature, and circumstances of the offense.

## 2. The History and Characteristics of the Defendant

Defendant Edwards has no prior criminal convictions other than traffic offenses, although the PSR does reference a possible record in North Carolina for which there is no additional information.  *Id.* at ¶¶ 74-81.

Defendant Edwards was born and raised in India.  PSR ¶¶ 83,87.  He emigrated to the United States at 23 years old and became a U.S. citizen.  *Id.* at ¶¶ 88, 93.  He has been married to his current wife since 1989, and they have three children ranging in age from 27 to 14 years old. *Id.* at ¶¶ 90-92.  Defendant Edwards is highly educated, having obtained a PhD in Information Systems, two master's degrees in Engineering Science for Computer Engineering and Electrical Engineering, and a Bachelor of Science degree in Computer Engineering Technology.  *Id.* at ¶¶ 121-23.  Defendant Edwards is the owner and CEO of TRG Networking, Inc. and also serves as a Cybersecurity professor at Howard Community College in Maryland.  *Id.* at ¶¶ 131, 134.  Prior to becoming Deputy Inspector General and Acting Inspector General at DHS, his positions included Director – Business Management Office at TSA's Office of Inspection as well as Director of System Development and Director of Policy and Technical Services at USPS-OIG.  *Id.* at ¶¶ 142, 145.

3. <u>The Need to Promote Respect for the Law and Deter the Defendant and
Others from this Type of Criminal Conduct</u>

Defendant Edwards and his co-conspirators engaged in an ongoing scheme that caused harm in a multitude of ways. It eroded the sense of security of government employees that their most sensitive employee data would be protected by their colleagues, and it exposed those same employees to risk that their data would be misused after landing in the hands of the foreign software developers. The scheme harmed DHS-OIG and USPS-OIG financially by requiring them to provide notice and credit monitoring to affected individuals. It also caused reputational harm, particularly to DHS-OIG, to the point that whistleblowers and law-enforcement partners were hesitant to work with them. *See* Trial Tr. 3/29/22 AM, 82:13–21 (Steel). This scheme also sowed greater distrust by the public in offices of inspector general more broadly given the head of the office, who was entrusted to root out waste, fraud, and abuse, was himself conspiring to misappropriate government resources for personal gain. Dr. Cuffari expressed this sentiment in his victim impact statement, writing, "At a time when the American public's trust in its government institutions is critically low, Edwards' criminal behavior built on that narrative, damaging public servants generally, and DHS OIG specifically." DHS-OIG VIS at 4. For all of these reasons, individuals need to be deterred from committing crimes of this nature.

4. <u>Unwarranted Sentencing Disparities</u>

The defendant's sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see*

*also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

In fashioning its sentencing recommendations for the defendants in this scheme, the government considered each defendant's conduct in the theft and fraud scheme, culpability relative to the other co-conspirators, and, for Defendants Edwards and Patel, their cooperation. The government's request for a sentence at the top of Defendant Edwards's Guidelines range is to reflect his greater culpability compared to Defendant Patel, who the government anticipates will have the same Guidelines range calculation as Edwards other than a possible adjustment under § 4C1.1. The government's goal in taking a wholistic view of all the defendants' circumstances was for its requested sentences to reflect a fair sentence for each defendant and avoid unwarranted sentencing disparities across the cases.

## D. Restitution and Forfeiture

As noted in the PSR, the government is not seeking restitution in this case. *See* PSR ¶ 56. Although the two victim agencies incurred substantial costs to notify the victims of the data

breach and provide them credit monitoring services, the Mandatory Victims Restitution Act ("MVRA") authorizes restitution only in cases of "damage to or loss or destruction of property" or "bodily injury." *See* 18 U.S.C. § 3663A(b); *see also* 18 U.S.C. § 3663(b) (same). For cases involving property damage or loss, the authorized forms of restitution are limited to return of the lost or damaged property and payment for the value of the lost or damaged property. *Id.* § 3663A(b)(1). Here, the case management systems were neither lost nor damaged. No provision of the statute authorizes restitution for the cost of victim notification and credit monitoring. *See United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir. 1989) (holding that Section 3663(b)(1) does not authorize restitution for consequential costs associated with property loss); *but cf. United States v. Janosko*, 642 F.3d 40, 41–42 (1st Cir. 2011) (holding that the MVRA authorizes restitution for the cost of credit checks performed in the course of an investigation under the subsection authorizing recovery of victims' "expenses incurred during . . . the investigation or prosecution of the offense"); *United States v. De La Fuente*, 353 F.3d 766, 773 (9th Cir. 2003) (holding that the MVRA authorizes restitution for "cleanup and decontamination" costs).

It should be noted, however, that USPS-OIG has indicated it would like to request restitution to reimburse the agency for the $33,147.84 it spent providing notice and credit monitoring services for the affected individuals. Additionally, one victim, S.B., submitted a victim impact statement seeking restitution in the amount of $296, representing lost income due to attendance at the trial in this case. *See* PSR ¶ 63. Although the government has not received the victim impact statement at the time of filing, an order of restitution to S.B. would appear to be appropriate under the provision of the MVRA that requires the order of restitution to "reimburse the victim for lost income and necessary child care, transportation, and other expenses

incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(B)(4).

Finally, because Edwards did not receive any "proceeds" from his offense conduct, the government is not seeking forfeiture. *See* 18 U.S.C. § 981(a)(1)(C) (authorizing forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the offense).

**E. Special Conditions of the Sentence**

The government agrees with the Probation Office's recommendation that the defendant participate in the Bureau of Prisons Parenting Program. *See* PSR ¶¶ 234-35. The government also requests the following as conditions of supervised release: community service, computer restrictions, software restrictions, and computer monitoring conditions.

### III.    CONCLUSION

WHEREFORE, for the foregoing reasons, the government requests that the Court grant a 3-level downward departure and sentence the defendant to 21 months' imprisonment on both counts, to run concurrently, followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES                         COREY R. AMUNDSON
UNITED STATES ATTORNEY                    CHIEF, Public Integrity Section
For the District of Columbia              U.S. Department of Justice

By: */s/ Christine M. Macey*              By:  */s/ Celia R. Choy*
CHRISTINE M. MACEY                        CELIA R. CHOY
D.C. Bar No. 1010730                      D.C. Bar No. 1017211
Assistant United States Attorney          Trial Attorney
Fraud, Public Corruption, and Civil Rights Section    Public Integrity Section
601 D Street, NW                          Criminal Division
Washington, D.C. 20530                    1301 New York Avenue, NW
(202) 252-7058                            Washington, D.C. 20530
christine.macey@usdoj.gov                 (202) 875-1557
                                          celia.choy@usdoj.gov